2015 IL App (5th) 130402

NO. 5-13-0402

NOTICE
Opinion filed May 6, 2015.
Modified upon denial of
rehearing July 14, 2015.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| FRANK C. BEMIS, D.C., d/b/a Frank Bemis & Associates, and DR. FRANK C. BEMIS & ASSOCIATES, CHIROPRACTORS, S.C., Individually and on Behalf of Others Similarly Situated, | ) ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 05-L-164 |
| EMPLOYERS MUTUAL CASUALTY COMPANY and EMC PROPERTY & CASUALTY COMPANY, a Wholly Owned Subsidiary of Employers Mutual Casualty Company, | ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Employers Mutual Casualty Company and EMC Property & Casualty Company, a Wholly Owned Subsidiary of Employers Mutual Casualty Company, Third-Party Plaintiffs; and Fair Isaac Corporation, Third-Party Defendant). | ) ) ) ) ) | Honorable William A. Mudge, Judge, presiding. |

_____

JUSTICE MOORE[*] delivered the judgment of the court, with opinion.
Justices Stewart and Schwarm concurred in the judgment and opinion.

_____

[*]Justice Spomer was originally assigned to participate in this case. Justice Moore was substituted on the panel subsequent to Justice Spomer's retirement and has read the briefs and listened to the tape of oral argument.

1

¶ 1    The plaintiffs, Frank C. Bemis, D.C., doing business as Frank Bemis & Associates, and Dr. Frank C. Bemis & Associates, Chiropractors, S.C. (Bemis), appeal the July 18, 2013, judgment of the circuit court of Madison County, which dismissed their class action claims against the defendants, Employers Mutual Casualty Company and EMC Property & Casualty Company, a wholly owned subsidiary of Employers Mutual Casualty Company (Employers Mutual), after the circuit court, on April 5, 2012, decertified the following class based on this court's decision in *Coy Chiropractic Health Center, Inc. v. Travelers Casualty & Surety Co.*, 409 Ill. App. 3d 1114 (2011):

"All healthcare providers in Illinois whose reimbursement for medical services to an Illinois workers' compensation claimant were [*sic*] paid at a reduced rate by Defendants pursuant to a First Health PPO discount from February 1, 2004 through [August 16, 2010]."

For the following reasons, we affirm.

¶ 2                                        FACTS

¶ 3    On August 22, 2007, Bemis filed a motion for class certification regarding claims Bemis previously made against Employers Mutual, which were restated in a first amended class action complaint filed on July 15, 2008.  Many of the facts of this case mirror those in *Coy*, although there are some important differences.  As in *Coy* (*id.* at 1115), Bemis entered into contracts with First Health and its predecessor, Community Care Network (CCN), to participate in a preferred provider agreement under which Bemis agreed to accept discounted reimbursements from payor insurance companies,

2

health care plans, or claims administrators with whom First Health and CCN had contracted. Like *Coy* (*id.*), Bemis alleges that Employers Mutual discounted bills it received from Bemis without steering patients to him because Employers Mutual did not offer financial incentives to its insureds for utilizing Bemis as their provider. As in *Coy* (*id.*), the allegations in the first amended complaint arise in the context of workers' compensation insurance, where insurance companies could not, by law, require employees to treat with a specific provider, except in very limited circumstances.[1]

¶ 4     The first amended complaint in the instant case contains the same theories of liability as the complaint in the *Coy* case. In count I, Bemis alleged that Employers Mutual's practice of discounting bills without providing financial incentives amounted to a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2008)) because Employers Mutual misrepresented to Bemis and the class that they were entitled to a preferred provider organization (PPO) discount. See *Coy*, 409 Ill. App. 3d at 1116. In count II, Bemis alleged unjust enrichment by Employers Mutual as a result of this practice. See *id.* In count III, Bemis alleged an alternative cause of action for a breach of contract. See *id.* Finally, in count IV, Bemis alleged a civil conspiracy based on Employers Mutual's

---

[1]Effective June 28, 2011, the Workers' Compensation Act was amended to permit employers to use a preferred provider program approved by the Illinois Department of Insurance, and to require an injured employee to be treated from a preferred provider network. 820 ILCS 305/8.1a (West 2012).

3

practice of entering into PPO networks with no intention to provide financial incentives to its insureds for utilizing the network.  See *id.*

¶ 5    Exhibit A to the first amended complaint is a document entitled "Community Care Network Professional Care Provider Agreement" (provider agreement) entered into between First Health's predecessor, CCN, and Bemis, dated April 28, 1998.  This provider agreement differs somewhat from the provider agreements involved in the *Coy* case, in that the provider agreement in the instant case does not specifically refer to a workers' compensation program or workers' compensation services.  See *id.* at 1116-17. However, the provider agreement also does not exclude workers' compensation programs or services.  Section 2.01 of the provider agreement reads as follows:

> "Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference.  Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein."

¶ 6    In section 1.06, the provider agreement defines "Payor Agreement" as "an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor."  In section 2.02, the provider agrees to accept the reimbursement amounts in Exhibit A as payment in full for health care services or benefits provided to beneficiaries

4

or claimants. In section 4.01, "Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts set forth in Exhibit A."

¶ 7 Section 5 of the provider agreement, entitled "Covenants of Provider," contains several provisions relevant to the issues on appeal. In section 5.07, the provider agrees that:

> "Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance where hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital."

In section 5.09, the provider agrees as follows:

> "To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after being notified by Provider that the proposed provider is not a CCN Provider."

As in *Coy*, there is no provision in the preferred provider agreement promising Bemis that patients would be steered to him via the use of financial incentives. See *id.*

¶ 8 A document was appended to the first amended class action complaint containing similar information as was contained in the "Explanation of Reimbursement" that was attached to the complaint in *Coy*. See *id.* at 1117. According to this document, Bemis

5

billed Employers Mutual for two chiropractic manipulations that were performed on a workers' compensation claimant in September of 2004. Bemis charged $31 for each manipulation, and according to the document, Employers Mutual discounted each charge by $7. A notation after the itemization of the discounts states, "Preferred Provider Organization: FIRST HEALTH."

¶ 9    The remaining facts of the instant case deviate from the facts in *Coy*. Unlike *Coy*, where the payor agreement between First Health's predecessor, CCN, and Travelers appeared of record, no payor agreement between First Health or CCN and Employers Mutual appears of record in the case at bar, and as will be set forth in more detail below, no such payor agreement exists. On November 13, 2008, Employers Mutual filed an amended third-party complaint against Fair Isaac Corporation (Fair Isaac), stating claims against Fair Isaac for contractual and common law indemnity, as well as unjust enrichment. According to the third-party complaint, on or about June 26, 1998, Employers Mutual entered into a software license agreement with Fair Isaac's predecessor corporation, CompReview, Inc., and on or about November 13, 2003, an additional services addendum to the software license agreement with Fair Isaac itself. Both agreements were attached to the third-party complaint.

¶ 10   Pursuant to the software license agreement and its addendum, Fair Isaac provided computer software to Employers Mutual which provided electronic access to preferred provider networks such that the preferred provider networks would review bills received by Employers Mutual in order to determine whether the bills were subject to a PPO agreement. After the software determined the applicability of a PPO reduction, Fair Isaac

6

then advised Employers Mutual of the amount of said reduction by providing Employers Mutual with an explanation of benefits. According to the third-party complaint, Employers Mutual relied on Fair Isaac to properly advise it as to whether a PPO reduction could be taken in any particular case and Employers Mutual paid Fair Isaac a fee based, in part, on the percentage of the PPO reductions taken.

¶ 11 Following a period of class certification discovery, Bemis filed a "Memorandum in Support of Class Certification." In the memorandum, with citation to the deposition of Employers Mutual's employees, further detailed below, Bemis explains the procedure Employers Mutual used to apply PPO discounts to medical bills submitted for payment on workers' compensation claims. According to Bemis's memorandum, Employers Mutual's claims processors enter information from the bills into a computer program called Smart Advisor, which is a program that Employers Mutual contracted with Fair Isaac to use to provide access to PPO networks. After the bills have been entered into Smart Advisor, "they are sent through the software to the PPO network administrators who then apply the PPO network discounts." The bills are then sent back to Employers Mutual through the Smart Advisor program.

¶ 12 Sometime later, it appears that Bemis filed a "First Amended Memorandum in Support of Class Certification." Although there are exhibits to this first amended memorandum in the record, as well as responses from Employers Mutual and Fair Isaac, this court is unable to locate the memorandum itself. Interestingly, in its brief on appeal, Employers Mutual argues that Bemis has conceded that First Health authorized Fair Isaac to enter into an agreement with Employers Mutual giving it access to the First Health

7

network, and in support thereof, provides the following quote from the description of the bill discounting process contained within Bemis's first amended memorandum, but states that "citation to the record is omitted":

"After the bills have been entered into Smart Advisor, they are sent through the software to First Health who then applies the PPO network discounts. Comp Review [now known as Fair Isaac] only provides the electronic bridge between Employers and First Health."

Bemis's reply brief does not address this argument or explain the absence of its "First Amended Memorandum in Support of Class Certification."

¶ 13   The exhibits to Bemis's "First Amended Memorandum in Support of Class Certification" contain, *inter alia*, the relevant contracts between Employers Mutual and Fair Isaac and its predecessor corporation, CompReview, Inc. (CompReview). Employers Mutual entered into a software license agreement with CompReview on June 26, 1998, in which CompReview granted Employers Mutual a license to use CompReview's "bill review and repricing computer program" for certain designated states, including Illinois, for a monthly fee. The software license agreement contains provisions for the "selection, implementation, and placement of *** PPO Networks" to be automated within the software. The software license agreement provides that, whether initiated by Employers Mutual or CompReview, all PPO networks are to be directed through CompReview, which has the right to accept or deny a PPO network based on the ability to automate the network, or by the "inability for [CompReview] to recognize benefit by automating such said network."

8

¶ 14    In the software license agreement, Employers Mutual agrees that if more than one PPO network is utilized, priority as to which network would be used to discount any given bill would be given "in a predetermined order agreed to between [CompReview] and the PPO Networks that provide [CompReview] access to the names of their Providers and Contract Rates."  As alleged in Employers Mutual's amended third-party complaint, the software license agreement contains provisions for indemnification of Employers Mutual.  The scope of these indemnification provisions and the merit of Employers Mutual's third-party complaint against Fair Isaac are not at issue in this appeal.

¶ 15    It does not appear from the exhibits to the initial software license agreement that CCN or First Health were included in the software package.  However, in 2004, Employers Mutual and Fair Isaac, as a successor corporation of CompReview, entered into a "Change Request to Services," in which Employers Mutual elected to "receive" First Health as "an additional PPO Network" and agreed to pay all associated fees.  According to this document, Employers Mutual would have access to the First Health network in several states, including Illinois, as of February 1, 2004.  It appears from this document that First Health was considered a network for repricing workers' compensation bills, and that Fair Isaac's fee for providing this electronic access to First Health's network was to be 25% of any discounts that Employers Mutual received as a result of this access.

¶ 16    Exhibit A to the "Change Request to Services," entitled "Requirements," contains terms that Employers Mutual agreed to follow in reference to "First Health PPO Network Services."  Noteworthy in terms of the disposition of this appeal, Employers Mutual

9

agreed to "offer the First Health Network to its eligible workers within specified geographic areas" and to "encourage claimants to use services of contract Providers through use of work place posters, provision of directories and educational material" or other means "unless prohibited by law."

¶ 17   On September 12, 2006, Employers Mutual and Fair Isaac entered into an "Application Service Provider Agreement" (2006 Agreement), whereby Employers Mutual gave Fair Isaac a license to use its bills, claim, and medical information, content, and data, and Fair Isaac granted Employers Mutual a license to use its bill processing services.  With regard to any "third[-]party products" provided by Fair Isaac, Employers Mutual agreed to comply with the terms and conditions of any contractual obligations to use or access such products, which Fair Isaac promised to provide to Employers Mutual. In the 2006 Agreement, Fair Isaac promised as follows:

> "4.4   PPO Network Obligations.  [Fair Isaac] warrants to make reasonably commercial efforts to ensure that [Employers Mutual's] use of the Services, including but not limited to Bill repricing, does not violate any federal, state or local statutes, laws or regulations or the contractual rights and/or obligations imposed on PPO Networks and Providers by the contractual arrangements between the PPO Network and the Providers, and that based on [Fair Isaac's] agreements with PPO Networks and Providers, [Employers Mutual] had the right to apply the Contract Rate to a properly submitted bill.

> \* \* \*

10

5.1 [Fair Isaac] Indemnification. [Fair Isaac] agrees to indemnify [Employers Mutual] and its directors, officers and employees and shall hold it and such persons harmless against any and all claims (including third[-]party claims), losses, costs, damages, liabilities and expenses, including without limitation, legal fees and costs incurred by [Employers Mutual,] arising out of or in connection with a determination that [Employers Mutual] was not entitled to access the PPO Networks or Contract Rates and apply such to Bills submitted to [Fair Isaac] by [Employers Mutual]."

¶ 18    Exhibit A-1 to the 2006 Agreement is an "Order Form: SmartAdvisor with Capstone Decision Manager."  This form "describes the Hosting Services and certain other Services provided to [Employers Mutual] under the terms and conditions of the [2006 Agreement]."  Paragraph 9 of the order form states that Fair Isaac will provide Employers Mutual with access to the PPO networks designated therein.  This paragraph states that Employers Mutual is to be bound, to the same extent as Fair Isaac, by all PPO network-imposed contractual obligations required for access to such PPO network, and that the 2006 Agreement is subject to any PPO network-imposed obligation or any other form of requirement imposed by a PPO network.  With regard to First Health, the order form contained the same requirements as the 2004 "Change Request to Services."  Sample First Health network contracts were also attached to the 2006 Agreement between Employers Mutual and Fair Isaac.  However, these samples were provider agreements.  There were no sample payor agreements attached to the 2006 Agreement, at least as it is contained within the record on appeal submitted to this court.

11

¶ 19 The depositions of, *inter alia*, Employers Mutual's medical management employee, Mary Jane Allgood, and its medical claims service manager, Kathleen Knutsen, are contained in the record on appeal. Both of these employees testified that the Fair Isaac software that Employers Mutual purchased provides an "electronic bridge" which "exports" the bills submitted to Employers Mutual to First Health, and that First Health "re-prices" the bills according to the "contract rates" and sends them back to Employers Mutual for payment.

¶ 20 On April 27, 2010, a hearing was held before the Honorable Daniel J. Stack on Bemis's amended motion for class certification. On August 16, 2010, Judge Stack issued a detailed order in which he analyzed the prerequisites for a class action as set forth in section 2-801 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-801 (West 2010)) and certified the class. On September 15, 2010, Employers Mutual filed a petition for leave to appeal Judge Stack's order certifying the class in this court pursuant to Illinois Supreme Court Rule 306(a)(8) (eff. Feb. 26, 2010), which this court denied on November 12, 2010. *Bemis v. Employers Mutual Casualty Co.*, No. 5-10-0449 (2010) (unpublished order). On December 20, 2010, Employers Mutual filed a petition for leave to appeal the order certifying the class to the Illinois Supreme Court pursuant to Illinois Supreme Court Rule 315 (eff. Feb. 26, 2010), which was denied on March 30, 2011. *Bemis v. Employers Mutual Casualty Co.*, No. 111595 (Ill. Mar. 30, 2011).

¶ 21 On March 14, 2011, this court issued its opinion in *Coy Chiropractic Health Center, Inc. v. Travelers Casualty & Surety Co.*, 409 Ill. App. 3d 1114 (2011) (modified upon denial of rehearing May 9, 2011). On April 25, 2011, Employers Mutual filed a

12

motion for reconsideration and to decertify the class in the instant case on the basis of the *Coy* opinion. On April 5, 2012, the Honorable William A. Mudge, who had been assigned the case following Judge Stack's retirement, entered an order granting the motion for reconsideration and decertifying the class. On April 12, 2012, Bemis filed a motion for reconsideration or clarification of Judge Mudge's order, which he denied on May 1, 2012. On May 9, 2012, Bemis filed a petition for leave to appeal the decertification order in this court pursuant to Illinois Supreme Court Rule 306(a)(8) (eff. Feb. 26, 2010), which this court denied on June 5, 2012. *Bemis v. Employers Mutual Casualty Co.*, No. 5-12-0200 (2012) (unpublished order). Bemis then filed a petition for leave to appeal the decertification order to the Illinois Supreme Court, pursuant to Illinois Supreme Court Rule 315 (eff. Feb. 26, 2010), and that petition was denied on September 26, 2012. *Bemis v. Employers Mutual Casualty Co*., No. 114576 (Ill. Sept. 26, 2012). On October 31, 2012, Employers Mutual filed a motion in the circuit court for the entry of judgment in its favor, which Judge Mudge granted on July 18, 2013. On August 14, 2013, Bemis filed a notice of appeal from the judgment.

¶ 22    On May 6, 2015, this court issued its original opinion affirming the circuit court's entry of judgment in favor of Employers Mutual. On May 26, 2015, Bemis filed a petition for rehearing. After consideration of the petition for rehearing, we issue this modified opinion upon denial of rehearing to address the issues Bemis raises therein.

¶ 23                                ANALYSIS

¶ 24    As we set forth in *Coy*, " '[t]he decision regarding class certification is within the discretion of the trial court and will not be disturbed on appeal unless the trial court

13

abused its discretion or applied impermissible legal criteria.' " 409 Ill. App. 3d at 1118 (quoting *Cruz v. Unilock Chicago, Inc.*, 383 Ill. App. 3d 752, 761 (2008), citing *Smith v. Illinois Central R.R. Co.*, 223 Ill. 2d 441, 447 (2006)). Although the decision of whether to certify a class typically rests upon the factors set forth in section 2-801 of the Code (735 ILCS 5/2-801 (West 2012)), in *Coy*, this court followed the Illinois Supreme Court's analysis in *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 72 (2007), finding that "there is no need to determine whether the prerequisites of the class action are satisfied if, as a threshold matter, the record establishes that the plaintiffs have not stated an actionable claim." *Coy*, 409 Ill. App. 3d at 1118. Here, Judge Mudge based his order decertifying the class on his finding that, based on our opinion in *Coy*, Bemis did not establish an actionable claim against Employers Mutual. On appeal, Bemis first argues that our decision in *Coy* was wrongly decided. Second, Bemis argues that this case can be distinguished from *Coy* because there is no payor agreement between First Health and Employers Mutual, and there is no evidence in the record to show that First Health authorized Fair Isaac to act as its representative in granting Employers Mutual access to the network. We will address each of these arguments in turn.

¶ 25 We first address Bemis's argument that this court's decision in *Coy* was made in error. In *Coy*, we held that because the plaintiffs' provider agreements with First Health did not contain provisions promising any particular steerage or financial incentives, the plaintiffs could not state a cause of action against the insurance company for a breach of contract. *Id.* at 1119. For the same reasons, we found that the insurance company's statement to the plaintiffs, that they were entitled to take a discount in accordance with

14

the First Health network, was not an actionable misrepresentation under the Consumer Fraud Act. *Id.* at 1122. Bemis argues that these findings were made in ignorance of clear Illinois Supreme Court precedent, which holds that the laws in operation at the time of an agreement become part of the contract by operation of law. See, *e.g.*, *Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 544-45 (1960). According to Bemis, because section 370i of the Illinois Insurance Code (215 ILCS 5/370i (West 2008)) defines a PPO as an arrangement requiring incentives, and because administrative regulations governing PPO networks (see 50 Ill. Adm. Code 2051.55(c)(1)(A), amended at 22 Ill. Reg. 5126 (eff. Dec. 9, 1997), and repealed at 34 Ill. Reg. 161 (eff. Dec. 16, 2009); and 50 Ill. Adm. Code 2051.280(a), adopted at 34 Ill. Reg. 163, 177 (eff. Dec. 16, 2009)) require that incentives be provided to insureds or beneficiaries for utilizing a network provider, such a requirement must be read into any purported payor agreement as an implied term. This argument fails for the following reasons.

¶ 26    First, we disagree that section 370i of the Illinois Insurance Code (215 ILCS 5/370i (West 2008)) defines a PPO as an arrangement requiring incentives. That section, entitled "Policies, agreements or arrangements *with incentives or limits on reimbursement* authorized" (emphasis added), provides, in subsection (b), as follows:

     "(b) An insurer or administrator *may*:

      (1) enter into agreements with certain providers of its choice relating to health care services which may be rendered to insureds or beneficiaries of the insurer or administrator, including agreements relating to the amounts to be charged the insureds or beneficiaries for services rendered;

(2) issue or administer programs, policies or subscriber contracts in this State that include incentives for the insured or beneficiary to utilize the services of a provider which has entered into an agreement with the insurer or administrator pursuant to paragraph (1) above." (Emphasis added.) 215 ILCS 5/370i(b) (West 2008).

¶ 27 The above-cited statutory provision does not purport to define a PPO and does not require incentives to be a provision of a provider contract. Even if we were to adopt Bemis's characterization of the statute as one defining a PPO, our reading of the permissive language of the statute reveals that it provides insurers and administrators with the flexibility to contract with providers to limit reimbursement amounts, to require incentives, or both. Subsection (c) provides specific disclosures in the event that an insurer "arranges, contracts with, or administers contracts with a provider whereby beneficiaries are provided an incentive to use the services of such provider" as authorized by subsection (b)(2). 215 ILCS 5/370i(c) (West 2008). These disclosures are not required in situations authorized by (b)(1), wherein the contract is merely a contract to limit reimbursement amounts. We see no way to read subsection (b)(2) as one defining a PPO, without reading (b)(1) in the same way.

¶ 28 Turning to the administrative regulations, cited above, we find that such regulations govern PPO administrators, such as First Health, and set forth provisions that are required of payor agreements. In *Coy*, we based our holding that the plaintiffs could not state a claim for a breach of contract against the insurance company on the fact that the plaintiffs were not promised financial incentives in their provider agreements, which

were the only contracts to which they were a party. 409 Ill. App. 3d at 1119. Our discussion of the promises made in the payor agreement at issue was a secondary discussion pointing out that, "[e]ven if it could be said that the plaintiffs are third-party beneficiaries to the payor agreement," the insurance company only promised to direct patients to network providers "as permitted by applicable law." *Id.* The first amended class action complaint does not state a cause of action for a breach of contract based on Bemis's purported status as a third-party beneficiary, but instead, its allegations presume that the provider agreement between Bemis and First Health and the payor agreement between First Health and/or its authorized representative are to be considered one contract. There are many potential problems with that theory (see *Walsh Chiropractic, Ltd. v. StrataCare, Inc.*, 752 F. Supp. 2d 896, 905-07 (S.D. Ill. 2010)), but this court need not make a determination of whether the two agreements could be considered one instrument, because, as detailed below, there are legal inconsistencies that are inherent in the proposition that any administrative regulation purporting to require financial incentives would be an implied term in this case.

¶ 29 On rehearing in *Coy*, we briefly addressed the plaintiffs' argument that the regulations governing PPO administrators should be considered an implied term of the payor agreement, and thus, the provider agreement, by operation of law. 409 Ill. App. 3d at 1121. The payor agreement in *Coy*, and the software license agreement in the case at bar, both require the insurance company to provide steerage "as permitted by applicable law" in the case of the former, and "unless prohibited by law" in the case of the latter. During the relevant time period, in the context of workers' compensation, applicable

17

Illinois law did not allow for financial incentives for employers to steer injured workers to network providers. See 820 ILCS 305/8(a) (West 2010).[2] To imply financial incentives as a contractual term in workers' compensation cases would ignore the plain language of the Workers' Compensation Act that prohibits such incentives. This is a contradiction that negates Bemis's argument.

¶ 30 The irreconcilable conflict that results from a fair application of the rule that Bemis advocates, that the law in effect at the time of a contract becomes part of the contract by operation of law, is a result of the incomplete nature of Bemis's statement of the applicable rule. A complete statement of this rule contains an important caveat, and that is, the rule applies only when the contract itself does not contradict application of the law to be implied as a term. See *Illinois Bankers' Life Ass'n v. Collins*, 341 Ill. 548, 553 (1930); *In re Estate of Savage*, 73 Ill. App. 3d 656, 659 (1979); *Larned v. First Chicago Corp.*, 264 Ill. App. 3d 697, 699 (1994); *Lincoln Towers Insurance Agency, Inc. v. Boozell*, 291 Ill. App. 3d 965, 969 (1997); *Brandt v. Time Insurance Co.*, 302 Ill. App. 3d 159, 170 (1998); *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 341 Ill. App. 3d 14, 18-19 (2003). For example, in *Schiro*, where the Illinois Supreme Court held that a

---

[2]Although the provider agreement in *Coy* specifically mentioned workers' compensation, Bemis's provider agreement required Bemis to accept reimbursement at contract rates from any First Health network payor, and nothing in the provider agreement, nor the administrative regulations Bemis cites, excludes workers' compensation patients.

18

building contract contained an implied term requiring compliance with applicable building ordinances, the contract left open the standards to which the building was to be built. *Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 544 (1960). In fact, the Illinois Supreme Court reasoned that "the parties to the contract would have expressed that which the law implies 'had they not supposed that it was unnecessary to speak of it because the law provided for it.' (12 I.L.P., 399.)" *Id.* The court went on to explain that "[c]onsequently, the courts, in construing the existing law as part of the express contract, are not reading into the contract provisions different from those expressed and intended by the parties *** but are merely construing the contract in accordance with the intent of the parties." *Id.* The same is not true in the case at bar, where Bemis agreed to accept discounts from all First Health network payors, which would include those covering workers' compensation patients where, during the relevant time period, applicable law prevented financial incentives. We find that it is for this reason that the payor agreement in *Coy*, and the software license agreement in the case at bar, required payors to provide steerage in accordance with, or unless prohibited by, applicable law.[3]

---

[3]Nor do we find that such a caveat would violate fundamental Illinois public policy. See *Larned v. First Chicago Corp.*, 264 Ill. App. 3d 697, 700 (1994) (the parties may only contradict application of a particular law within a contract if that law does not embody fundamental Illinois public policy). As stated before, subsection 370i(b) of the Illinois Insurance Code appears to permit, but not require, insurers or administrators to contract with providers simply to limit reimbursement amounts or to include a provision

¶ 31    The foregoing analysis illustrates our statement in *Coy* that, assuming that the PPO arrangement at issue violated the above-cited administrative regulations due to the limiting language in the payor agreement, or in this case, software license agreement, requiring Employers Mutual to steer "unless prohibited by law," the remedy for that violation is not a cause of action for breach of contract against Employers Mutual because these regulations, which are set forth by the Department of Insurance, govern the PPO administrators, such as First Health.[4]  409 Ill. App. 3d at 1121.  "It is the province of the Department of Insurance, and not this court, to determine whether the payor agreements met the requirements of the regulations."  *Id.*  For the foregoing reasons, we reaffirm our holding in *Coy.*

¶ 32    Before we turn our attention to Bemis's argument that it was error to decertify the class based on *Coy* due to the absence of a contract in the record proving that Fair Isaac was an authorized representative of First Health, we will briefly address Bemis's argument that, assuming Fair Isaac was authorized to contract with Employers Mutual on behalf of First Health, Employers Mutual's payor agreement was *per se* invalid under the terms of the provider agreement.  According to Bemis, because the recitals in the provider agreement state that "CCN [First Health's predecessor] intends to execute

for incentives.  We find no fundamental public policy favoring one type of contract over another.

[4]The record reflects that Bemis filed a class action against First Health, which was settled.

20

contracts with Payor organizations which offer a preferred provider or exclusive provider health care coverage plan," and Employers Mutual did not offer such a plan, Bemis should have a cause of action against Employers Mutual for breach of contract, fraud, or unjust enrichment. We do not agree. There is no allegation in the complaint nor evidence in the record that Employers Mutual ever promised or represented to Bemis, or anyone, that it offered a "preferred provider or exclusive provider health care coverage plan," as was contemplated in the recitals to the provider agreement between Bemis and CCN (First Health). The actual terms of the provider agreement do not define "payor" as an entity that offers such a plan, but rather, define "payor" as an entity which has an obligation to provide benefits to a claimant and a "payor agreement" as an agreement between CCN (First Health) or its authorized representative and a "payor" which provides for providers such as Bemis to render health services to claimants at the agreed reimbursement amounts. For these reasons, we find no justification for imputing CCN (First Health's) intentions as stated in the recitals to the provider agreement onto Employers Mutual, a nonsignatory to the provider agreement. Accordingly, we will proceed to determine the merit of Bemis's arguments that this case is distinguishable from *Coy* on the basis that there is no proof that Fair Issac was an "authorized representative" of First Health.

¶ 33    In order to assess the viability of Bemis's causes of action against Employers Mutual in light of the absence, in the record, of a contract that demonstrates Fair Isaac was an authorized representative of First Health, we must examine each cause of action in turn. First, we find that the absence of this contract between First Health and Fair

21

Isaac does not change our analysis of Bemis's claim for breach of contract against Employers Mutual. A breach of contract claim necessarily assumes that a contract did exist between these parties. If Fair Isaac was not an authorized representative of First Health, then in no case could it be said that a contract existed between Bemis and Employers Mutual, under either an incorporation-by-reference theory or a third-party-beneficiary theory, because the software license agreement could not be construed as a "payor agreement" as that term is defined in the provider agreement. Accordingly, the absence of a contract of record between First Health and Fair Isaac does not distinguish the breach of contract claim in the case at bar from the one in *Coy*, and the circuit court was correct in finding that Bemis cannot state a cause of action for breach of contract against Employers Mutual based on this record.

¶ 34 We now turn to Bemis's cause of action for a violation of the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2008)). As we set forth in *Coy*:

"The elements of a Consumer Fraud Act action are as follows:

'(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.' " 409 Ill. App. 3d at 1122 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 180 (2005)).

¶ 35 The deceptive act or practice on the part of Employers Mutual that Bemis alleges is Employers Mutual's notation on the explanation of benefits it sent Bemis which stated

22

that the bill was being discounted based on "Preferred Provider Organization: FIRST HEALTH." In *Coy*, we found that it was clear from the record that there was no deceptive act or practice by the defendant, because the defendant did belong to the First Health network. Our finding was based on the fact that the payor agreement between First Health and the defendant, which provided the defendant access to the First Health network, was contained in the record. *Id.* Here, as Bemis aptly points out, there is no payor agreement between First Health and Employers Mutual. Instead, the record contains a software license agreement between Fair Isaac and Employers Mutual, purporting to grant access to the First Health network via the Smart Advisor software, and containing provisions substantially similar to those contained in the payor agreement in *Coy*. Bemis argues that this distinction raises a question regarding whether Employers Mutual's statement in the explanation of benefits it sent to Bemis, which suggested it had access to the First Health network, was deceptive. According to Bemis, although the provider agreement between Bemis and First Health defines "payor agreement" as "an instrument between a Payor and CCN or its authorized representative," absent a contract between First Health and Fair Isaac, there is no evidence in the record on which to base a determination that Fair Issac was an "authorized representative" of First Health. We disagree.

¶ 36   We find evidence in the record to establish that First Health authorized Fair Isaac to provide access to its network. As detailed in Bemis's memorandum in support of class certification, and the deposition testimony of the claims handlers for Employers Mutual, and as reflected in the software license agreement itself, the Smart Advisor software

23

created a bridge to First Health, and First Health verified Employers Mutual's status as a First Health payor. We find that the fact that First Health accepted the transmission of Employers Mutual's bills over Fair Isaac's network, applied the PPO discount, and sent the bill back over Fair Isaac's network to Employers Mutual provides proof that Fair Isaac was an "authorized representative" of First Health. Even if First Health merely provided Fair Isaac access to its network provider database for use in its Smart Advisor software, such an act would constitute an authorization as well. Accordingly, the software license agreement is to be considered a "payor agreement" pursuant to the terms of Bemis's provider agreement, and any representation by Employers Mutual that it belonged to the First Health network is not actionable under the Consumer Fraud Act.

¶ 37 With regard to Bemis's claim for unjust enrichment, we find that the analysis we employed in *Coy* applies and supports Judge Mudge's decision to decertify the class because no such cause of action can be stated as between the parties. 409 Ill. App. 3d at 1122-23. Employers Mutual cannot be said to have retained a benefit to Bemis's detriment because the record establishes that it had a legitimate payor agreement with an authorized representative of First Health. See *id.* at 1123. Nor is this a case where Bemis rendered services to Employers Mutual such that a quasi-contract arose for the reasonable price of those services. See *id.* Rather Bemis's services were to the injured employee and/or his employer, who is obligated to pay for the injured employee's treatment by virtue of Illinois workers' compensation law. *Id.* For these reasons, Judge Mudge did not err in decertifying this class based on a theory of unjust enrichment. And because any claim for civil conspiracy requires wrongdoing on the part of Employers Mutual, that

24

claim would not give rise to a cause of action that would justify certification of the class. See *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994) ("Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." (citing *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222 (1990))). Thus, because we have determined that the record belies all of the legal theories Bemis pleads in his first amended class action complaint, the circuit court did not err in decertifying the class. See *Coy*, 409 Ill. App. 3d at 1118 (citing *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 72 (2007)).

¶ 38                                CONCLUSION

¶ 39    For the foregoing reasons, the judgment of the circuit court of Madison County in favor of Employers Mutual is affirmed.


¶ 40    Affirmed.

2015 IL App (5th) 130402

NO. 5-13-0402

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| FRANK C. BEMIS, D.C., d/b/a Frank Bemis & Associates, and DR. FRANK C. BEMIS & ASSOCIATES, CHIROPRACTORS, S.C., Individually and on Behalf of Others Similarly Situated, | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | No. 05-L-164 |
| EMPLOYERS MUTUAL CASUALTY COMPANY and EMC PROPERTY & CASUALTY COMPANY, a Wholly Owned Subsidiary of Employers Mutual Casualty Company, | ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Employers Mutual Casualty Company and EMC Property & Casualty Company, a Wholly Owned Subsidiary of Employers Mutual Casualty Company, Third-Party Plaintiffs; and Fair Isaac Corporation, Third-Party Defendant). | ) ) ) ) ) | Honorable William A. Mudge, Judge, presiding. |

_____

**Opinion Filed:** May 6, 2015
**Modified Upon Denial of Rehearing:** July 14, 2015

_____

**Justices:**          Honorable James R. Moore, J.

                        Honorable Bruce D. Stewart, J., and
                        Honorable S. Gene Schwarm, J.,
                        Concur

_____

**Attorneys**          Timothy F. Campbell, Campbell & McGrady Law Office, 3017 Godfrey Road,
**for**                  P.O. Box 505, Godfrey, IL 62035; Robert W. Schmieder II, Mark L. Brown, SL
**Appellants**        Chapman, LLC, 330 North Fourth Street, Suite 330, St. Louis, MO 63102

_____

**Attorney**          Thomas R. Pender, Cremer, Spina, Shaughnessy, Jansen & Siegert, LLC,
**for**                  One North Franklin Street, 10th Floor, Chicago, IL 60606
**Appellees**

_____